CITY OF SPRINGFIELD *vs.* JAMES BOYLE, executor.

Hampden.    September 25, 1895. — November 29, 1895.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Contract of Indemnity — License — Trial — Action — Defence — Evidence.*

An instrument signed by M. recited that, in consideration of a license granted to a certain society by the authorities of a city to occupy a portion of the street in front of the society's lot where it was erecting a building, he agreed "that they shall comply strictly with the terms of said license, and indemnify the city from all loss, cost, or expense that it may suffer by reason of the occupancy described in said license." A person was injured, after the expiration of the license, by falling upon a depression in the sidewalk in front of the society's building, and recovered damages in an action against the city for his injury. In an action by the city against M. upon the instrument, the plaintiff introduced evidence tending to show that the depression was caused by teaming over the sidewalk during the erection of the building; and the defendant introduced evidence tending to show that it was caused by the laying of sewer and water pipes. *Held*, that the plaintiff was bound to satisfy the jury that the depression was caused by the teaming, and also that it happened within the time covered by the license.

It is competent for the jury, at the trial of an action, to compare the testimony of different witnesses, and to accept a part and reject a part, and if the verdict was or might have been reached in that manner it must stand, if there was any evidence beyond a scintilla to support it.

In an action by a city, upon an agreement to indemnify it for all loss caused by reason of the occupancy by a religious society under a license granted by the city, of a portion of the street in front of the society's lot where it was erecting a church, to recover the sum paid by the city as damages in an action against it by a person injured by falling upon a depression in the sidewalk in front of the building, it appeared that the foundation of the building had been put in before the license was granted, which was in May, 1889, for three hundred days; and there was evidence warranting the conclusion that the sidewalk was in good condition down to the time when the erection of the walls began, in May or June. There was also evidence that substantially all the wall was put up in 1889; that the towers were finished and the remaining stone put up in the following spring; that during the construction of the church the sidewalk was used for the storage of stone and brick; that teams were driven across it with

brick and stone and "broke it all up"; and that two or three months after the accident the sidewalk in front of the church was relaid by the parish. *Held*, that it was competent for the jury to find, on this evidence, that the depression in the sidewalk was caused by the teaming over it during the time covered by the license.

In an action upon a written agreement signed by the defendant, reciting that, in consideration of a license granted to a certain society by the authorities of a city to occupy a portion of the street in front of the society's lot where it was erecting a building, he agreed that the society should "comply strictly with the terms of said license," which was granted on condition that the society should conform to an ordinance of the city, the fact that no written agreement was given to the city by the society, as required by the ordinance, cannot be availed of in defence of the action.

If an agreement is signed by a person, reciting that, in consideration of a license granted to a certain society by the authorities of a city to occupy a portion of the street in front of the society's lot, where it was erecting a building, he agrees "that they shall comply strictly with the terms of said license, and indemnify the city from all loss, cost, or expense that it may suffer by reason of the occupancy described in said license," and the city pays a sum recovered as damages in an action against it by a person injured by falling upon a depression in the sidewalk in front of the building, the city is not obliged to attempt to collect of the society the sum so paid before bringing an action upon the agreement.

An instrument signed by M. recited that, in consideration of a license granted to a certain society by the authorities of a city to occupy a portion of the street in front of the society's lot where it was erecting a building, he agreed "that they shall comply strictly with the terms of said license, and indemnify the city from all loss, cost, or expense that it may suffer by reason of the occupancy described in said license." A person was injured, after the expiration of the license, by falling upon a depression in the sidewalk in front of the building, and recovered damages in an action against the city for his injury. In an action by the city against M. upon the instrument, several witnesses for the plaintiff testified that, before the occupancy under the license, the sidewalk was in good condition; that, during the erection of the building, teams loaded with brick and stone were often driven across the walk; and that the brick and stone were stored on it. *Held*, that the evidence was admissible.

CONTRACT, against the executor of the will of James J. McDermott, upon the following instrument, dated May 29, 1889, signed by "James J. McDermott, Treas.," and sealed: "In consideration of a license granted the Sacred Heart Society, by the supervisors of highways and bridges of the city of Springfield, to occupy a portion of the street in front of their lot on Chestnut and Linden Streets, where they are erecting a building, I hereby agree that they shall comply strictly with the terms of said license, and indemnify the city from all loss, cost, or expense that it may suffer by reason of the occupancy described in said license, and I further agree, at the end of the term for which said license is granted, that they shall remove

all rubbish made or deposited on said street in the erection of said building, and put that portion of the street in as good condition as it was before its occupancy by them." Indorsed upon it was the approval of the board of supervisors of highways and bridges.

The declaration alleged that the defendant's testator, for a good consideration, executed to the plaintiff the contract above set forth ; that the Sacred Heart Society did not strictly comply with the terms of the license named therein ; that the society did not, at the end of the term for which the license was granted, put that portion of Chestnut Street named in the license and the contract in as good condition as it was before its occupancy by the society ; that the society had not indemnified the plaintiff from all loss, cost, or expense which it suffered by reason of such occupancy ; that, by reason of the use made by the Chestnut Street society, as covered by the license, the same became in a defective condition, and was unsafe for public travel ; that one Mary Cullinan, while on her way to attend the church of the society, on March 20, 1892, and while in the exercise of due care on her part, fell, by reason of such defective condition of the street ; that she instituted suit to recover damages therefor, and recovered against the plaintiff judgment for $813.60 damages, and $57.16 costs of suit, which sums the plaintiff was obliged to, and did pay her ; and that, by reason of such failure on the part of the society to comply with the terms of the license, the plaintiff had suffered great damage, which the defendant was obligated to it to pay.

Trial in the Superior Court, before *Dewey*, J., who allowed a bill of exceptions, in substance as follows.

Elijah A. Newell, a witness for the plaintiff, testified that he was the city clerk of Springfield ; that he had the contract declared on ; that a license was issued in connection with the contract, and was mailed to McDermott ; and that the license read as follows :

" City of Springfield.   Springfield, May 29, 1889.   A license is hereby granted to Sacred Heart Society to occupy a portion of Chestnut and Linden Streets, not to exceed eight feet of their width, in front of their lot on said street, for depositing building materials thereon while building ; provided, said materials shall

be in the street no more than three hundred days, and that the said Sacred Heart Society shall conform to Sections 1 and 2 of ' Ordinance No. 80, to amend Ordinance No. 44 of said City of Springfield,' as follows:

" ' Section 1. No person, except the superintendent of streets in the performance of his duties, shall break or dig up the pavement or ground in any public street, or any sidewalk or common in the city, or erect any staging for building thereon, or place any materials or rubbish thereon, without first obtaining from the board of supervisors of highways and bridges a written license, stating the space in the street or other public place that may be occupied, and the time allowed for such occupancy, and such other provisions as they may deem best, and filing with the city clerk a written agreement, under seal, approved by said supervisors, to comply strictly with the terms of the license, and indemnify the city from all loss, cost, or expense that it may suffer by reason of such occupancy.

" ' Section 2. Whenever any street, lane, alley, or sidewalk, or other public place in the city, shall, under any license granted, as provided in the preceding section, be dug up, obstructed, encumbered, or otherwise thereby rendered unsafe or inconvenient for travel, the person so licensed shall put, and at all times keep up, a suitable railing. . . . And shall also execute and file with the city clerk a written agreement, under seal, approved by said supervisors, to comply strictly with the terms of this license, and indemnify the city from all loss, cost, or expense that it may sustain by reason of the occupancy of the street above described.' "

It was signed by the board of supervisors of highways and bridges.

The witness further testified that the approval was placed upon the contract two days after it was signed by McDermott, and before the license was mailed to him; that the license had got that; that "we approved it at the same time"; and that, on May 31, 1889, it was read before Edward S. Bradford, mayor, John McFetheries, and L. Z. Cutler, supervisors of highways and bridges.

On cross-examination, he testified as follows:

" The license was issued for three hundred days; that was the

outside limit; there was no agreement, bond, or any other agreement of indemnity, or anything of that kind except this one; we received no agreement, contract, or any writing whatever from the Sacred Heart Society; the agreement was signed in the office; I was city clerk at that time; I kept no copy of this license; McDermott came in there as other people do, and he signed that bond after looking it over."

Mary Cullinan, a witness for the plaintiff, testified as follows:

" On Sunday, March 20, 1892, I went to church along Chestnut Street, at about seven o'clock in the morning; near the north side of the new Sacred Heart Church, on Chestnut Street, I fell down and broke my arm; the sidewalk was uneven and there was ice on it; I fell forward on my hand; I fell about the middle of the sidewalk; I can't tell how uneven the sidewalk was; I don't remember whether there was a hole there; when my foot struck, I knew it was uneven."

Willie Foy, a witness for the plaintiff, testified as follows:

" I was with Mrs. Cullinan on the day she received her injury; when she received the injury she was next the north tower of the new edifice of the Sacred Heart Church; she was about in the centre of the sidewalk; the sidewalk was very uneven; you could see the edges of the brick where there was a depression; she fell right on the ice; of course, there must be a depression to have ice there; I suppose the depression of the brick caused the ice to form; the ice was a patch as large as the seat of a chair; it was about in the centre of the walk and nearly to the north entrance of the church."

Melvin H. Strong, a witness for the plaintiff, testified as follows:

" In 1892 I lived at the corner of Chestnut and Everett Streets, the next corner to where this sidewalk was; I think I had lived there nine or ten years previous to March 20, 1892; I remember the time when they began the erection of their new edifice, but I don't remember the year; the building is of brick and stone; I could n't tell you how long they were in building the stone work; before they began work, the sidewalk in front of the church was good; during the erection of the church teams were driven across the walk with brick and stone, and it broke it all up; they made no other use of it in particular that I know of; they had to drive the teams across to get their brick and

stone up near the church where they used it; I never saw any material dumped exactly on the sidewalk; this driving of teams occurred along by the church, in front of the church; from that time on nothing was done in repairing or fixing the walk until they got done there."

Edward P. Blake, a witness for the plaintiff, testified as follows:

" In March, 1892, I lived on Carew Street; in going to my work from my house, I would pass the Sacred Heart Church usually four times a day, sometimes six; I recollect about when the church was begun; the condition of the sidewalk in front of that church, before they began the construction, was good, first class, recently relaid; it was as smooth as any walk I know of in Springfield; they used the walk, during the construction of the church, for the storage of material to a great extent, and I have seen the teams drive across it a great many times; brick and stone were stored on the walk; as near as I can remember, there were two or three places, at least, where they crossed that walk, had planks laid down, and a good portion of the time the walk was so obstructed that materials and teams could n't get through except here and there; I should say two years, at least, the walk was in that condition."

On cross-examination, the witness testified as follows:

" I think the cellar was built of brick; I don't remember whether there was any stone in the cellar; there was a good deal of teaming round when they were digging the cellar; I don't think the most of the teaming was done at that time."

Waitstill H. Allis, a witness for the plaintiff, testified as follows:

" I live on Carew Street, beyond this church; I recollect the fact of their beginning the erection of this church; at the time they began to use it, it was a good sidewalk; it had been recently relaid and was practically a new walk; along in the early part of the hauling of material there, they would drive in, two of them, get unloaded, drive out down across the walk, and turn out on the north side where there was a regular open driveway; to my recollection there were two or three places where they drove over the walk; that continued up to quite recently, within a year, I should think."

The testimony of the witnesses, Strong, Blake, and Allis, was admitted against the plaintiff's objection and exception.

John M. Keough, a witness for the defendant, testified as follows :

" I am the janitor of the Sacred Heart Church, and have been for nine years ; during the nine years I have been there, there has been a sidewalk laid on Chestnut Street ; during those nine years there has been no other sidewalk laid there ; I could n't exactly tell just when they began to dig the cellar of the church, and I don't remember when they began to lay the brown stone ; during the progress of the work they used to drive in there at the north side of the church, go back and forth ; the brown stone was piled up between the curbstone in Chestnut Street and the sidewalk ; the biggest part of the stone was taken from there in a hand-barrow, with two men, and some taken with a little truck, with two handles to it ; this was a little two-wheeled truck, with wheels about three or three and a half inches wide ; the stone was put on these trucks and drawn in there ; during the progress of this work from the beginning, nothing was done to the sidewalk ; during all the progress of this work, the walk was never obstructed only when the big stone was coming in there for the steps ; when these stones were coming in, the teams backed up to the curbing on Chestnut Street and then they put a plank on a level with the team, slanted it in towards the walk and lifted the steps from the top of the wagon to the outside of the walk ; none of this material or timber touched the walk ; it was bearing on the blocking, and the blocking rested one end upon the wagon and the other end on the ground inside of the sidewalk ; this same thing was done for each of the tower doors."

On cross-examination the witness testified as follows :

" Up to the time they began to build on top of the foundation, the church people had n't done anything in going over the walk ; whatever was done was done after the foundation was up ; I could n't exactly say whether it was after April, 1889, that they began to lay the ashler ; when the ashler began to come for that church, they began to store it all along Chestnut Street, between the sidewalk and the curb ; they did n't pile much in front, most of it went round to the back of the church ; they had two ways of getting the ashler over the sidewalk ; one was to carry it on a platform and the other was to drag it over on this truck ; I

never saw them taking more than one at a time; they would wheel it across the walk, then dump it and come back and get some more; in July, 1892, two or three months after the accident, the sidewalk in front of the church was relaid by the parish."

Peter T. McGuire, a witness for the defendant, testified as follows:

"I passed by the church and property of the Sacred Heart Society on Chestnut Street four times a day for fourteen years; I remember the time they were building the Sacred Heart Church on Chestnut Street; the cellar wall was made of granite, no brick in it; during those years that I was passing through, there was no interference or interruption of travel upon the sidewalk in front of the church on Chestnut Street; the corner stone of the church was laid the 21st day of October, 1888; when the corner stone was laid, nothing more than what I should call the water-table to the building was erected."

On cross-examination, the witness testified as follows:

"This church is a large brown stone church; there was a good deal of stone out there at the front sometimes; some of the stone was pretty large; it was all brown stone; it was piled on what they called the grass plot, between the sidewalk and the curbing; I suppose the large stones were taken over from the street and got in there some way; after the corner stone was on, they did no more work on the church that winter; they waited until the next summer."

Thomas F. Bourke, a witness for the defendant, testified as follows:

"I was employed as a carpenter on the Sacred Heart Church; I began to work late in May or early in June, 1889; I continued to work there until the 30th of December, the same year; the work stopped then for some little time; during the time I was there, at the north side of the church, there was a temporary driveway made, and they drove in there with the stone and material for the building; there was also a driveway at the rear of the church on Linden Street; they also unloaded some of the ashler on the Chestnut Street side, and piled it on the grass plot between the curbing and the bricks; I think there was no teaming in front of the church on the place where the church stands,

on the brick sidewalk; the ashler that was on the grass plot between the brick walk and the curbing was taken into the premises in a hand-barrow, some of it, and some of it was carried in by two men on to the scales and derrick; there was nothing done to the sidewalk during the progress of the work that I know of."

On cross-examination the witness testified as follows:

"We started framing the roof in July or August, 1889; they were ready for part of the roof in October, I guess; I doubt if the entire ashler for the roof was finished that winter, when the work was stopped, the 20th of December; they shut everything down the 20th of December, and I think in the spring afterwards they finished the towers and put up the remaining stone; substantially, all the wall was put up in 1889."

Jeremiah R. Driscoll, a witness for the defendant, testified as follows:

"I live on Greenwood Street, near the corner of Chestnut Street, a little south of the Sacred Heart property; I am a contractor and excavator; I did the excavating for the cellar of the Sacred Heart Church and got the foundations ready; that was commenced the latter part of May, 1888; in 1887 and 1888 I had the contract from the city for laying the sewers; in such capacity, I connected the Sacred Heart property with the Chestnut Street sewer in October, 1888; that was done so as to be about four or five feet south of where the pipe actually was, — four or five feet, I should think, south of the north tower of the church; it was a very deep sewer; the soil was moist hard-pan over the hard red clay within six or seven feet of the surface, and then a mixture of hard-pan and sand; I had no shoring for the walls of that trench; I had to dig down fifteen feet, four and a half feet wide, without any bracing; there was a brick sidewalk at that time; I had to take up the brick; I think the water pipe was put in shortly after; there was no water pipe when I laid the sewer; that was put in the same trench; it was part of the same ditch; the sidewalk settled; it started at the side of the trench; it would naturally commence settling there; this had settled pretty near the width of the trench; in the centre it would naturally settle more; Foy pointed out the place where he said Mrs. Cullinan fell; it was right over this sewer

and water pipe; I laid the bricks; there is a brick curbing against the brick walk; the water getting between the bricks and the sidewalk would naturally crowd them out; I never saw any teaming done but what they used to draw their sand from Linden Street in front of the church and then turn in on Chestnut Street; they used to bring the brick on Everett Street, back of the church, and pile it up, and the ashler was mostly laid on Linden Street; a team could n't get in in front of the church edifice on the brick sidewalk; it would be impossible, so that there would be no teaming in front of the church edifice only on the Linden Street walk; they built a platform, the wagon was backed up across Chestnut Street and the horse was taken out, and then they built a platform with cribs from the wagon level with the wagon, and built it right straight to the steps of the church, and the platform was taken upon that, rolled in upon the rollers from the wagon on to the place in the entrance of the church; they were certainly two feet, and in some places three feet above the sidewalk; there was no pressure on the sidewalk; after they picked out what they wanted of the ashler on the grass plot, between the brick sidewalk and the curbing, they put it on hand-barrows and carried it in; they don't do any harm to the sidewalk unless they do it with their feet; I never saw a time when the sidewalk was n't perfectly clear; I never saw any harm come to the sidewalk from the building operations."

On cross-examination, the witness testified as follows:

" It would be impossible for teams to drive in in front of the church with a load; there were no big stones in the church with the exceptions of the platform and pilasters, no stone that would weigh over 300 pounds in the whole church outside of the pilasters and the steps; all the stone, big and small, that lay between the sidewalk and that church edifice never got in there by being taken in on a wagon in front; my attention was first called to this matter the Sunday the woman fell; that walk had been there probably ten years; it was not a new walk just laid; the new walk was laid about two years ago; that was the first walk that was laid after this accident; the sidewalk settled there, which it does wherever a sewer is laid in Springfield; it had been settling for two years, a little, more or less; it did n't look like a place in the walk as would be made by crushing in the

walk by weight ; it looked like a settle, and that is what I know it was, as I passed by it every day."

The defendant testified that he had charge of McDermott's papers and effects, and did not find any such license as was spoken of among his papers and effects.

It was agreed that Chestnut Street was a public highway ; that McDermott, who signed the instrument in suit, died July 26, 1891; that there was no question that the Sacred Heart Society existed ; that Mary Cullinan recovered in her suit against the city of Springfield the sum of $813.60 ; that judgment was rendered for that sum and paid by the city ; that the plaintiff in this action, if entitled to recover anything, was entitled to recover that sum with interest ; that the date of the defendant's appointment as executor was December 16, 1891; and that the Sacred Heart Society was solvent.

At the close of the evidence, the defendant asked the judge to give, among other instructions, the following :

" 1. Upon all the evidence, the defendant is entitled to a verdict.  2. Upon the whole evidence, the license issued to the Sacred Heart Society was illegal and void, and the defendant's testator was not bound by his guaranty of acts done or to be done thereunder.  3. Upon all the evidence, the occupancy of the sidewalk on Chestnut Street by the Sacred Heart Society, during the term of the license, did not cause the injury to Mary Cullinan, and the defendant is not liable for the amount which the plaintiff was obliged to pay to Mary Cullinan.  4. There is no evidence that the plaintiff has made any attempt to collect the amount of said damages from the Sacred Heart Society, and the plaintiff therefore cannot recover in this action.  5. There is no evidence that there was any use or occupancy of the sidewalk by the Sacred Heart Society at the point where Mary Cullinan fell and received her injury, and the plaintiff therefore cannot recover."

The judge refused to give the instructions requested, and instructed the jury, among other things, as follows :

" The plaintiff must satisfy you that at the point where Mrs. Cullinan met with her injury there was a defect in the sidewalk caused by the Sacred Heart people in using the sidewalk in connection with the construction of the church, under the license, and during the period of the license, and they must satisfy you that

that defect continued, had not been removed, had not been repaired, but continued down to the time when Mrs. Cullinan fell, and operated to produce her injury. I do not think it is legally necessary, in order that the defendant might be held responsible, if the other conditions of responsibility exist, that the accident should have happened during the period of the license, but it must be made to appear so that you are satisfied of it by the preponderance of the evidence, that during the period of three hundred days the people building the church produced a defect in the sidewalk, caused a state of things which appeared and was found in Mrs. Cullinan's case to be a defect, and that that condition continued unremedied down to the time when she met with her injury, and was the cause of that injury. If the plaintiff satisfies you of these facts, then the plaintiff would be entitled to recover. . . .

" Now, it may occur to you that nobody comes to testify directly to any specific act or acts of the Sacred Heart Society producing the defects. The evidence has been laid before you, the course of events, course of conduct, and you are asked to infer from the nature of the occupancy, which the plaintiff claims to have shown by the evidence, that this defect was produced in this way. And, on the other hand, you have the evidence and the suggestion that, if there was a defect there, it was caused by the laying of the sewer pipe and by the depression of the ground after it. Now, in any matter like this, where you have to find a fact, it is not necessary that there should be some witness called to testify to the precise fact which you are asked to find. It often becomes the duty of the jury, in dealing with a case, to find that a certain thing took place and that a certain thing occurred, a certain thing was done, from evidence of circumstances going before that thing, following after and surrounding it, which naturally and reasonably point to the conclusion that the thing in question or the act in question took place. That is, they may reach the conclusion, as an inference from other facts proved to their satisfaction, which seem in their minds to justify it. . . . So that, as the result of the whole matter, bearing in mind that the burden of proof is upon the plaintiff, it is for you to say whether the evidence satisfies you that this license was issued, and that there was this defect in the street, and that that defect was caused by the use which the Sacred Heart people made of the sidewalk under this license. If

so, the plaintiff is entitled to a verdict.   If you are not so satis-
fied, then the defendant is entitled to your verdict."

The jury returned a verdict for the plaintiff; and the defend-
ant alleged exceptions.

*W. H. McClintock*, (*J. B. Carroll* with him,) for the defendant.
*G. D. Robinson*, for the plaintiff.

MORTON, J.   We discover no error in the instructions given,
or in the refusals to instruct as requested.   It plainly was a ques-
tion of fact for the jury whether the depression in the sidewalk
where Mrs. Cullinan fell was caused by the laying of the sewer
and water pipe, or by teaming over the sidewalk.   The plaintiff
was bound to satisfy them that it was caused by the teaming,
and also that it happened within the time covered by the license,
and the court so instructed the jury.   The plaintiff was not re-
quired to show just when or how the teaming produced the hole
in the sidewalk.   It was sufficient if it offered evidence of facts
and circumstances from which it fairly might be inferred that
that caused it at some time during the continuance of the license.
The jury was not bound to believe all that every witness said.
It was competent for the jury to compare the testimony of dif-
ferent witnesses, and to accept a part and reject a part, and if
the verdict was or might have been reached in that manner, it
must stand, if there was any evidence beyond a scintilla to
support it.

We think that there clearly was such evidence.   The foun-
dation of the church had been put in before the license was
granted; but there was testimony warranting the conclusion
that the sidewalk was in good condition down to the time when
the erection of the walls began.   One Keough, a witness for the
defendant, so testified.   It did not appear very clearly when
that was, but the jury, we think, reasonably might have found
it to have been in the latter part of May or in the first part
of June, 1889.   There was also testimony that substantially all
the wall was put up in 1889, and that the towers were finished
and the remaining stone put up in the following spring; that
during the construction of the church the sidewalk was used for
the storage of stone and brick; and that teams were driven
across it with brick and stone, and, as one witness said, " broke
it all up."   There was also the fact, which one of the defend-

ant's witnesses testified to on cross-examination without objection, that two or three months after the accident the sidewalk in front of the church was relaid by the parish.

It was competent for the jury to find on this testimony that the depression in the sidewalk was caused by the teaming over it during the time covered by the license; though they might also have found, if they had seen fit, that it was due to the laying of the sewer and water pipe.

The fact that no written agreement was given to the city by the Sacred Heart Society, as required by the ordinance, cannot avoid the agreement entered into by the defendant's testator, unless it was a condition precedent or subsequent that he should not be liable if such an agreement was not furnished by the Society to the city. No such condition is expressed or implied in the agreement, which is an absolute undertaking on his part that the society shall do certain things; amongst others, " indemnify the city from all loss, cost, or expense that it may suffer by reason of the occupancy described in said license." The society has not done that, and consequently the defendant is liable.

The plaintiff plainly was under no obligation to attempt to collect of the society the amount which it had been forced to pay in consequence of the defect in the sidewalk. The agreement was an original undertaking, and was not affected or impaired by the fact that the defendant's testator might have no remedy over against the society. If he had wished to provide for that contingency, something covering it should have been inserted in the agreement. *Bishop* v. *Eaton*, 161 Mass. 496, 501.

The jury properly may have understood the testimony of Strong, Blake, and Allis as referring to the time when the erection of the walls began, and to the subsequent use of the sidewalk. Its tendency was to show that the sidewalk was broken up and made defective by the society, and on that ground it was admissible.

*Exceptions overruled.*